DAVID M. FURBUSH (CA Bar # 83447)
**Law Office of David M. Furbush**
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 655-1121
Email: dmf@furbush.com

Attorney for Plaintiff Alan B. Kalin

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Alan B. Kalin, an individual,<br><br>Plaintiff,<br><br>v.<br><br>Semper Midas Fund, Ltd.; Gregory A. Parsons, an individual; David Bree, an individual; Semper Capital Management, L.P.; Semper Capital Partners LLC; RDP I LLC; RSL Capital LLC; Stephen C. Ellwood, an individual; Richard D. Parsons, an individual; Ronald S. Lauder, an individual; and Gregory W. Ellis, an individual,<br><br>Defendants. | Case No. 4:21-cv-01062-YGR<br><br>(San Mateo County Superior Court No. 21-CIV-00134)<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE CALIFORNIA SECURITIES LAWS** |

Plaintiff alleges:

**NATURE OF THIS ACTION**

1. This is an action by Plaintiff Alan B. Kalin ("Plaintiff" or "Kalin") to recover damages for catastrophic losses incurred on an investment made in the Semper Midas Fund, Ltd. (the "Fund").

2. The Fund was established to invest primarily in mortgage-backed securities ("MBS"), asset backed securities ("ABS"), commercial mortgage-backed securities ("CMBS") and other fixed

income securities across the capital structure and credit quality spectra, as well as direct obligations of the United States or any agency or instrumentality thereof ("Treasury and Agency Securities"), money market instruments including commercial paper and repurchase agreements collateralized by Agency and non-Agency MBS (meaning mortgage-backed securities not issued or guaranteed by any government agency such as FNMA or GNMA) and other assets.

3. On December 1, 2019, Plaintiff purchased, through the Alan Kalin IRA, his self-directed investment retirement account, securities of the Fund in the amount of $330,000. The purchase was made in California. In making his investment, Plaintiff relied upon an offering memorandum prepared by the Fund's investment advisor, Semper Capital Management, L.P. ("Semper Capital").

4. On April 22, 2020, a mere five months after his investment, Plaintiff was shocked to receive a letter from Semper Capital stating the Fund had experienced a loss in value of "over 50%" during the preceding month. As Plaintiff later learned, this was a dramatic understatement. He was subsequently informed that his investment had lost 93% of its value in just a matter of a few days.

5. The offering memorandum and other communications from the Fund and Semper Capital contained written or oral communication that included untrue statements of material fact and omitted to state material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading, in violation of the California securities laws.

6. In October 2020, Plaintiff sold his securities back to the Fund for $ 22,676.56, for a loss of $307,323.44, over 93% of his original investment.

7. This action is brought against the Fund, Semper Capital, and several persons and entities who controlled the Fund for recovery of Plaintiff's losses.

**CAUSES OF THE LOSS**

8. Following the catastrophic loss of his investment, Plaintiff had a telephone call with Tom Mandel, Chief Investment Officer of Semper Capital, to understand what had happened.

9. Mandel informed Plaintiff that at the time of Plaintiff's investment in Semper Midas and into March 2020, the Fund had equity capital of approximately $180 million, and debt (or leverage) of approximately $2 for each $1 of equity, or approximately $360 million, with total investment

assets about equal to the sum of equity + debt. The investments consisted almost entirely of mortgage-backed securities (MBS) not issued or guaranteed by a government agency, i.e., non-agency MBS. In turn, per Tom Mandel, the leverage in the fund consisted entirely of 30-day repurchase agreements (reverse repurchase agreements from a seller's perspective). These are commonly referred to as repo arrangements.

10. Repo is a generic name for both repurchase transactions and buy/sell-backs arrangements. In a repo, the first party sells an asset (usually fixed-income securities) to the second party at one price and commits to repurchase the same or another part of the same asset from the second party at a different price at a future date or (in the case of an open repo) on demand. If the first party (seller) defaults during the life of the repo, the second party (buyer) can sell the asset to a third party to offset his loss. The asset therefore acts as collateral and mitigates the credit risk that the buyer assumes with respect to the seller.

11. Although an asset is sold outright at the start of a repo, the commitment of the seller to buy back the asset in the future means that the buyer has only temporary use of that asset, while the seller has only temporary use of the cash proceeds of the initial sale. Thus, although the repo is structured legally as a sale and repurchase of securities, it behaves economically like a collateralized or secured loan. The principal use of repo arrangements is in fact the secured borrowing and lending of cash.

12. The difference between the price paid by the buyer at the start of a repo and the price he receives at the end is his return on the cash that he is effectively lending to the seller. This return is quoted as a percentage per annum rate and is called the repo rate. This is economically equivalent to interest on a loan.

13. For clarity and simplicity, when repo agreements are discussed in this Complaint, the Fund (the seller of assets in the repo) will be referred to as the borrower and the counterparty (the purchaser of assets in the repo) will be referred to as the lender.

14. The term of repo agreements can range from 24 hours to two or more years. All the repo agreements used by the Fund had a 30-day term, according to Tom Mandel.

15. The repo agreements deployed by the Fund, had "margin" requirements that obligate the Fund to maintain collateral value equal to a stipulated percentage multiplied by the original asset purchase amount. This was a high percentage of original collateral value. The Fund's repo agreements contained daily "mark to market" provisions that allowed the lender to base a margin call based on a single-day price decline and to demand payment no later than close of business on the following trading day. While theoretically the Fund could satisfy that demand by adding securities to the collateral held by the lender and/or by delivering cash to the lender, the over-leveraged condition of the Fund meant that it had no wherewithal to do this.

16. In the case of the Fund the margin deficit became large due to a sudden, although very brief and temporary, lack of liquidity in the market for mortgage-backed securities, resulting in a large spread between "bid" and "ask" prices for such securities. On information and belief, for at least a few days in March 2020 the spread was larger than 30%. Very few transactions occurred on these days making it difficult or impossible to attribute a "market price" to the collateral, but when counterparties forced liquidation of the collateral the sales were made at the abnormally low "bid" prices, with the losses being absorbed by the Fund investors. Because of the high leverage of the Fund, forced sale of its assets at, say, a 30% discount meant an actual loss of 90%.

17. None of this was unforeseeable. There have been a number of similar liquidity crises affecting the structured credit markets in recent history. Prudent managers will subject their portfolios to periodic stress testing. Stress testing involves, among other things, simulations designed to evaluate what are called "scenarios" to a given portfolio. A scenario is a representation of a macro-economic or geopolitical event which has the potential to impact investment returns. Proper stress testing requires simulating a broad spectrum of risk scenarios to evaluate the effect on a portfolio. In this case, however, the Fund's stress testing was woefully inadequate and failed to test scenarios that were reasonably foreseeable and in fact had occurred over the prior decade.

18. Prior to making his investment in the Fund, Plaintiff was provided two "Fact Sheets" about the Fund prepared by Semper Capital, one showing that leverage as of June 2019 was 185% and the other showing that leverage as of September 2019 was 200%. Although the Fund and Semper Capital provided a leverage figure, they omitted material information needed to understand the risks

associated with that leverage, including that in the event of temporary illiquidity for non-agency MBS the repo agreements could require immediate forced sale or trigger seizure of virtually all the assets of the Fund into an illiquid market resulting in catastrophic losses; that all of the repo agreements were subject to daily mark-to-market margin calls; that the Fund had no other credit facilities or sources of capital to forestall forced asset sales or seizures; that the Fund had no hedging positions to reduce the losses to the Fund in such a scenario; and that the Fund managers were not routinely stress-testing the Fund's portfolio for a range of significant price declines and volatility of the type seen in recent financial history and/or plausible to occur in the future. Uninformed of these risks, and in reliance on numerous assurances in the offering memorandum regarding preservation of capital, stress-testing, scenario analysis, liquidity, hedging strategies, risk management and downside protection, as more fully described below, and reassured by statements that Semper Capital was founded in 1992, that its managers are experience and capable, that its clients include corporations, foundations and universities, mutual funds and public funds, Plaintiff felt comfortable making his investment.

**GENERALLY ACCEPTED METHODS AND PRINCIPLES FOR LIQUIDITY STRESS TESTING AND CONTINGENCY FUNDING PLANS**

19. As the name implies, stress testing is a method of evaluating how resilient a financial entity (bank, brokerage firm or, in this case, an investment fund) will be when subjected to events that may cause losses or failures. Stress tests can be used to test various attributes and capabilities of a financial entity. One of the most important tests is the liquidity stress test.

20. The importance of liquidity risk management first came to prominence after the near collapse of Long-Term Capital Management ("LCTM") in 1998. There are several significant similarities (and a few significant differences) between LCTM and the Fund.

21. Like the Fund, LCTM was a hedge fund incorporated in the Cayman Islands. Like the Fund, LTCM was primarily invested in seemingly safe investments – 80% of its balance sheet consisted of government bonds of G7 countries (the United States, Canada, France, Germany, Italy, Japan and the United Kingdom), while other investments included seemingly safe corporate bonds and mortgage-backed securities. Like the Fund, investors were attracted to LTCM in part due to the

reputations and perceived experience and expertise of its managers. Like the Fund, LCTM was highly leveraged using, in part, repo agreements (although LCTM was even more highly leveraged). Like the Fund, LCTM's downfall was precipitated by a sudden and unexpected event that roiled financial markets – in this case, the Russian sovereign debt default of 2008, when Russia devalued the ruble and declared a moratorium on its government bonds. Like the events of March 2020, this sparked a flight to quality, in which investors avoided risk and sought liquidity, causing risk spreads and liquidity premiums to rise sharply. Like the Fund, efforts to liquidate LCTM's assets in an illiquid market initially led to sales at fire sale prices. Like the Fund, investors in LCTM lost 90% of their investments.

22. Unlike the Fund, LTCM was huge, with over $125 billion in assets, and unlike the Fund, lenders arranged a rescue pursuant which they took a 90% ownership interest, leaving 10% behind for the investors.

23. In April 1999, the President's Working Group on Financial Markets (consisting of the heads of Treasury, the Federal Reserve, the SEC and the CFTC) issued a report entitled "Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management." One of the key issues identified in the report was "***how events that are assumed to be extreme and very improbable should be incorporated into risk management and business practice.***" [Emphasis added.] The report noted that "some existing risk models have underestimated the probability of severe loss…when outlier events are omitted from risk models, such decisions may be made by default." The report noted sadly that "market history indicates that even painful lessons recede from memory with time." Among its recommendations were that procedures for estimating potential future losses and stress testing should be improved, that stress testing should gauge exposures in volatile and illiquid markets, and that boards of directors must understand the strengths and weaknesses of their risk measurement systems, including model risk, liquidity risk, and risk of breakdown of historical correlations among different instruments and markets.

24. Stress testing once again came to prominence in the wake of the great financial crisis of 2008-2009. Since that time regulators, industries and individual organizations throughout the developed world have converged on generally accepted standards for stress testing.

25. .According to Moody's Analytics, a leading provider of economic research regarding risk, performance, and financial modeling, liquidity stress testing must include multiple scenarios; be forward looking; be performed using different time horizons (e.g. overnight, 30-day, 90-day, and one year time horizons); use results to determine a liquidity buffer; and incorporate the conclusions into a contingency funding plan.

26. According to CME group, which operates the Chicago Mercantile Exchange, Chicago Board of Trade, and the New York Mercantile Exchange, one of the required scenarios is the "extreme but plausible" set of circumstances relating to price or volatility. A worst-case scenario would be one as to which there can be 100% certainty nothing more severe could occur. An extreme but plausible scenario is one as to which there can be 99.9% confidence that nothing worse will happen. In other words, the extreme but plausible scenario is severe indeed, but not the absolute worst case. Extreme but plausible scenarios are constructed in part by looking at historical events (e.g. the LTCM crisis, the failure of Lehman Brothers, the 1987 stock market crash, and the market disruptions resulting from the September 11, 2001 attacks).

27. However, history should not be the only basis for constructing scenarios. Many regard the Basel Committee on Banking Supervision's report on stress testing principles to be the leading authority on proper design and implementation of stress tests. That report cautions that:

> The scenarios and sensitivities used in stress tests should be reviewed periodically to ensure that they remain relevant. Consideration should be given to historical events and hypothetical future events that take into account new information and emerging risks in the present and foreseeable future. Scenarios not based on historical events and empirically observed relationships may be warranted for some or all risks if new or heightened vulnerabilities are identified, or if historical data do not contain a severe crisis episode.

In other words, scenarios must include hypothetical severe events and should not be limited to those that have actually occurred in the past.

28. According to MSCI Research, an arm of Morgan Stanley Capital International, which provides research relating to portfolio risk and performance analytics to institutional investors and hedge funds, large financial losses are likely to be accompanied by increases in volatility. Therefore, the stress test must evaluate not only the ability of the financial entity to withstand a drop in value of assets but also the probable increase in volatility that would accompany it.

29. The Federal Reserve periodically issues stress test scenarios. As an example of a severely adverse scenario, the February 2020 guidance called for a hypothetical drop of 50% in equity prices accompanies by a rise in the VIX (a measure of volatility of the S&P 500 stock index) of 70%. To put this in context, the VIX has exceeded 70% on only ten days in its entire 18-year history, five in October and November of 2008, and five in March 2020, and on those days, it never exceeded 80%. This amounted to only 2/10 of 1% of all trading days during this period.

30. Non-agency mortgage back securities are not traded on exchanges and data on volatility and bid/ask spreads is hard to obtain. However, it is clear that the market for such securities is ***far*** less liquid than the S&P 500, even under benign conditions. According to a report by the Federal Reserve Bank of New York, "Only a small number of non-agency residential MBS have been issued since mid-2007 and, during this period, secondary markets for trading non-agency MBS have been extremely illiquid." This means that a focus on liquidity stress testing using even more conservative assumptions than recommended for the highly liquid S&P 500 should have been used in liquidity testing the Fund, whose assets consisted almost entirely of much more illiquid assets. Since bid/ask spreads are in part a function of volatility, the Fund should have employed stress test scenarios involving an extreme but plausible increase in the bid/ask spread. This it did not do.

31. Once an extreme but plausible liquidity scenario has been identified, the next step is to create a contingency funding plan, or CFP. This involves maintaining enough high-quality liquid assets to meet sudden or unexpected funding obligations. This requires access to funds from sources that are both liquid, such as cash, or assets having deep markets, low credit risk, and low market risk, such as Treasury bills, and that are also unencumbered (not subject to restrictions and not pledged or used to secure obligations).

32. FINRA (the Financial Industry Regulatory Authority that regulates brokerage firms and investment advisers such as Semper Capital) warns that reliance on shorter-term financing to fund longer-term assets, as the was the case with the Fund, elevates the significance of funding and liquidity risk indicators. It states that stress testing must consider sudden reductions in the market value of collateral, including those that could lead a counterparty to demand additional collateral or else to liquidate positions at fire-sale prices, as in fact happened here. It advises that entities should

extend maturity terms beyond overnight for repurchase agreement (repo) positions or other short-term funding sources and establish irrevocable lines of credit or other supplementary sources of short-term funding, neither of which were done by the Fund. It cautions that failure to do this may expose the entity to the need to sell less-liquid assets at fire sale prices which, again, is what happened here. The time in which the highly liquid assets can be deployed must be at least as quickly as the settlement period of the obligations. In the case of the Fund, which was highly leveraged with repos on which margin calls could occur on one day's notice, this means that highly liquid funds must be accessible immediately. No such precautions were taken by the Fund.

33. The Fund, and its manager, Semper Capital, failed miserably to perform adequate liquidity stress testing and to establish an adequate contingent funding plan. In fact, as discussed below, there was apparently no CFP.

34. When plaintiff spoke to Tom Mandel on September 30, 2020, Mandel admitted that the stress scenarios for the Fund had "primarily focused on credit risk, default rate increases, and sector impacts." In other words, that it had focused primarily on the *quality* of the underlying assets (residential mortgages), not the *liquidity* of those assets. He stated that Semper Capital had considered the possibility of bid/ask spreads widening by up to 10%. In fact, on information and belief, in March 2020 bid/ask spreads briefly spiked to over 30%. He stated that Semper Capital had never even considered the possibility of a sudden large short-term increase in volatility and drop in liquidity. He said "we missed the mark that values could fall that much" so quickly. In other words, the Fund and Semper Capital failed to follow accepted liquidity stress testing protocols.

35. Worse, Mandel admitted that the Fund had no line of credit or other ready source of funding in place that could be drawn on in such a scenario. He said that after the margin calls were made by the repo counterparties. defendant Lauder "was putting one together but counterparties refused to wait" until that could be accomplished.

36. The temporary disruption of markets in March 2020 were extreme but not implausible on either an historical or hypothetical basis. Historically, events far more severe than the 10% drop which Semper Capital modeled had occurred in this country and other jurisdictions. Financial entities in this country experienced sudden and dramatic losses in the 1998 LTCM and 2008

financial crises; so did those in Argentina in 2000, Turkey in 2001, Iceland in 2008, Spain in 2008, and the Eurozone in 2010. From a hypothetical standpoint, a short panic causing liquidity to dry up and assets unable to be sold on less than a day's notice was plausible, even if extreme.

37. As further evidence of the cavalier approach the Fund took to stress testing and measurement of liquidity, neither stress tests nor liquidity were ever discussed at meetings of the Fund's board of directors during the period January 2018 through May 2021 -- even ***after*** the debacle of March 2020. Such abdication of responsibility at the board level does not comport with the standards for proper liquidity risk management and planning.

**FALSE AND MISLEADING STATEMENT RELIED UPON BY PLAINTIFF**

38. The offering memorandum represented that the Fund engaged in "rigorous cash flow modeling, scenario analysis and stress testing." The representation that it engaged in ***rigorous*** scenario analysis and stress testing implied that it conformed to generally accepted standards, which, as discussed above, require stress testing using extreme but plausible scenarios. The representation that it engaged in ***rigorous*** cash flow modeling implied that it conformed to generally accepted standards It did not do this. To the contrary, it failed its sources of liquidity, probable realizations from forced asset sales, and the impact on equity of the fund in the event that the asset prices fell more than 10% due to a rapid increase in bid-ask spreads. It failed to advise investors of that risk and its magnitude and impact on investor's equity in the fund. This representation was thus false and misleading.

39. The offering memorandum represented that the Fund maintained a "constant focus on liquidity, risk management and downside protection." Read in connection with the representations regarding rigorous scenario analysis and stress testing, this again implied that the Fund had established a contingency funding plan sufficient to meet the demands that the stress test calculated would be needed in the extreme but plausible scenario, which in fact it did not do, making this representation false and misleading. The assertion that the Fund maintained "a constant focus" on liquidity and risk management is belied by the fact that it was never discussed at its board meetings.

40. The offering memorandum stated that repo agreements presented "a certain amount of collateral risk" but that by utilizing hedging strategies any decline in value would be "substantially,

if not fully, offset by the hedging vehicle." This was false and misleading in two ways. First, the statement that there was only a "certain amount" of risk was misleading as, in fact, the risk was extreme due to the ***undisclosed*** facts that 100% of the leverage was procured through short-term repos, the repo agreements were subject to margin calls on less than 24 hours' notice, the market for the collateral in question was highly illiquid even in normal circumstances, and the false statement that any decline in value would be ***substantially if not fully*** offset by hedging instruments. Second, there was no hedging vehicle in place to protect against a situation, ***undisclosed*** in the offering memorandum, where collateral was marked to market every day and in which a margin call would have to be satisfied within by the close of business the following day or else see the collateral sold at fire sale prices.

**THE DEFENDANTS**

**The Fund**

41. The Fund is a corporation formed under the laws of the Cayman Islands and having its principal place of business in the Cayman Islands.

**The Director Defendants and Why They are Subject to Personal Jurisdiction**

42. Defendant Gregory A. Parsons is a Director of the Fund and controls the Fund. As such he is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As a director of the Fund he would necessarily have been personally aware of the false and misleading statements in the offering memorandum and of the fact that the offering memorandum was being used to induce purchases by persons in California. This constituted purposeful direction of activities with California residents, subjecting him to personal jurisdiction. He is also subject to personal jurisdiction as a controlling person of an entity which is subject to personal jurisdiction.

43. Defendant David Bree is a Director of the Fund and controls the Fund. As such he is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As a director of the Fund he would necessarily have been personally aware of the false and misleading statements in the offering memorandum and of the fact that the offering memorandum was being used to induce purchases by persons in California. This constituted purposeful direction of activities with

California residents, subjecting him to personal jurisdiction. He is also subject to personal jurisdiction as a controlling person of an entity which is subject to personal jurisdiction.

44. Gregory Parsons and Bree are hereinafter referred to as the Director Defendants.

**The Semper Capital Defendants and Why They are Subject to Personal Jurisdiction**

45. Defendant Semper Capital Management, L.P. ("Semper Capital"), a Delaware limited partnership, is the investment manager of the Fund. Semper Capital directed and controlled all sales, marketing, and investment activities of the Fund. Among other things, Semper Capital authored the offering memorandum containing the misrepresentations described below. As a control person of the Fund, and as the direct maker of the misrepresentations on which this Complaint is based, Semper Capital is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As the investment manager of the Fund and the author of the offering memorandum it would necessarily have been aware of the false and misleading statements in the offering memorandum and of the fact that the offering memorandum was being used to induce purchases by persons in California. This constituted purposeful direction of activities with California residents, subjecting it to personal jurisdiction. Semper Capital does not dispute that it is subject to personal jurisdiction in this case.

46. Defendant Semper Capital Partners LLC ("Semper Partners") is a Delaware limited liability company that is the General Partner of Semper Capital and controls Semper Capital, which in turn controls the Fund, making Semper Partners a control person of the Fund. As a control person of the Fund, Semper Partners is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As the general partner of Semper Capital, Semper Partners it would necessarily have been aware of the false and misleading statements in the offering memorandum and of the fact that the offering memorandum was being used to induce purchases by persons in California. This constituted purposeful direction of activities with California residents, subjecting it to personal jurisdiction. Semper Partners does not dispute that it is subject to personal jurisdiction in this case.

47. Defendant RDP I LLC (RDP) is a Delaware limited liability company that is a direct owner of Semper Capital and controls Semper Capital. RDP is identified as a control person in Semper Capital's Form ADV filed under penalty of perjury with the United States Securities and Exchange

Commission. Semper Capital in turn controls the Fund, making RDP a control person of the Fund. As a control person of the Fund, RDP is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As a controlling person of an entity over which personal jurisdiction does exist, he is subject to personal jurisdiction.

48. Defendant Gregory A. Parsons, in addition to being a director of the Fund, is also a direct owner of Semper Capital and controls Semper Capital. Gregory Parsons is identified as a control person in Semper Capital's Form ADV filed under penalty of perjury with the United States Securities and Exchange Commission. Semper Capital in turn controls the Fund, making Parsons a control person of the Fund. Gregory A. Parsons is also an indirect owner of Semper Capital and is a Member of Semper Partners and controls Semper Partners, which in turn controls Semper Capital, which in turn controls the Fund, making a Gregory Parsons a control person of the Fund. As a control person of the Fund, Gregory Parsons is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As a controlling person of an entity over which personal jurisdiction does exist, he is subject to personal jurisdiction.

49. Defendant RSL Capital LLC is a Delaware limited liability company that is a direct owner of Semper Capital. RSL is identified as a control person in Semper Capital's Form ADV filed under penalty of perjury with the United States Securities and Exchange Commission. Semper Capital in turn controls the Fund, making RSL a control person of the Fund. As a control person of the Fund, RSL is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As a controlling person of an entity over which personal jurisdiction does exist, he is subject to personal jurisdiction.

50. Defendant Stephen C. Ellwood is the Chief Operating Officer and Chief Legal Officer of Semper Capital and a direct owner of Semper Capital and controls Semper Capital. Ellwood is identified as a control person in Semper Capital's Form ADV filed under penalty of perjury with the United States Securities and Exchange Commission. Semper Capital in turn controls the Fund, making Ellwood a control person of the Fund. As a control person of the Fund, Ellwood is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As the chief operating officer and chief legal officer of Semper Capital he would necessarily have been

personally aware of the false and misleading statements in the offering memorandum and of the fact that the offering memorandum was being used to induce purchases by persons in California. This constituted purposeful direction of activities with California residents, subjecting him to personal jurisdiction. He is also subject to personal jurisdiction as a controlling person of an entity which is subject to personal jurisdiction.

51. Defendant Richard D. Parsons is an indirect owner of Semper Capital and is the Managing Member of RDP and controls RDP, which in turn controls Semper Capital. Richard Parsons is identified as a control person in Semper Capital's Form ADV filed under penalty of perjury with the United States Securities and Exchange Commission. Semper Capital in turn controls the Fund, making Richard Parsons a control person of the Fund. As a control person of the Fund, Richard Parsons is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As a controlling person of an entity over which personal jurisdiction does exist, he is subject to personal jurisdiction.

52. Defendant Ronald S. Lauder is an indirect owner of Semper Capital and is a Member of RSL and controls RSL, which in turn controls Semper Capital. Lauder is identified as a control person in Semper Capital's Form ADV filed under penalty of perjury with the United States Securities and Exchange Commission. Semper Capital in turn controls the Fund, making Lauder a control person of the Fund. As a control person of the Fund, Lauder is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As a controlling person of an entity over which personal jurisdiction does exist, he is subject to personal jurisdiction.

53. Defendant Gregory W. Ellis is an indirect owner of Semper Capital and is a Member of Semper Partners and controls Semper Partners, which in turn controls Semper Capital. Ellis is identified as a control person in Semper Capital's Form ADV filed under penalty of perjury with the United States Securities and Exchange Commission. Semper Capital in turn controls the Fund, making Ellis a control person of the Fund. As a control person of the Fund, Ellis is statutorily liable under Cal. Corp. Code § 25504 for the Fund's violations of law. As a controlling person of an entity over which personal jurisdiction does exist, he is subject to personal jurisdiction.

54. Semper Capital, Semper Partners, RDP, Gregory Parsons, RSL, Ellwood, Richard Parsons, and Lauder are hereinafter referred to as the "Semper Capital Defendants."

55. The Director Defendants and the Semper Capital Defendants are hereinafter collectively referred to as the "Control Defendants."

**The Doe Defendants**

56. Plaintiff is unaware of the names of the Defendants identified herein as DOES 1-20, inclusive, and therefore sues them by those fictitious names. Plaintiff is informed and believes, and on that basis alleges, that Defendants sued herein as DOES are responsible in some manner for the practices, acts, conduct, and occurrences alleged herein, as either actual perpetrators or coconspirators, control persons, aiders and abettors, officers, directors, and/or managing agents with the knowledge, control, authority, direction, and/or ratification of the other Defendants. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of the DOE Defendants and the roles they played once their identities and/or manner of participation in the wrongful conduct herein described is ascertained.

**FIRST CLAIM FOR RELIEF**

*(Against the Fund for Violation of California Corporations Code §§ 25401 and 25501)*

57. On or about December 1, 2019 the Fund offered and sold in this state a security by means of written and oral communications that included untrue statements of material fact and omitted to state material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

58. Plaintiff suffered damages as a result.

59. The Fund is therefore liable for damages under California Corporations Code §§ 25401 and 25501.

**SECOND CLAIM FOR RELIEF**

*(Against the Director Defendants for Liability Under California Corporations Code § 25504)*

60. As directors of the Fund the Director Defendants are liable to Plaintiff for damages under California Corporations Code § 25504.

**THIRD CLAIM FOR RELIEF**

*(Against the Control Defendants for Liability Under California Corporations Code § 25504)*

61. As persons who directly or indirectly control the Fund, the Control Defendants are liable to Plaintiff for damages under California Corporations Code § 25504.

**PRAYER FOR RELIEF**

62. WHEREFORE, based on the foregoing, Plaintiff respectfully requests that this Court award damages to Plaintiff as provided for in California Corporations Code § 25501.

Dated: March 14, 2022

Respectfully Submitted,

*/s/ David M. Furbush*
David M. Furbush
**Law Office of David M. Furbush**
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 655-1121
Email: dmf@furbush.com

*Attorney for Plaintiff*